**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

CLERKS OFFICE US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED

June 10, 2026

LAURA A. AUSTIN, CLERK
BY: /s/ Nik Sams
DEPUTY CLERK

|  |
|---|
| United States of America ex rel. J. Bryan Quesenberry, <br><br> Plaintiff <br><br> v. <br><br> Crossroads Community Services Board and Unknown John and Jane Does, <br><br> Defendants. |

Case No.  3:26cv61

## SECOND AMENDED COMPLAINT

Plaintiff/Relator J. Bryan Quesenberry, a licensed attorney acting on behalf of the United States of America (the **"Government"** or the **"Federal Government"**) and against each Defendant, alleges, based upon personal knowledge, relevant documents, information, and belief, as follows.

### INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and caused to be made by each Defendant and/or its agents and employees, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. **("FCA")**.

2. This action seeks to recover millions of dollars wrongfully obtained by Defendants for Crossroads Community Services Board ("Crossroads") through the Federal Government's Payroll Protection Program **("PPP")**.

3. Crossroads is a government-owned and -controlled entity, as detailed below.

4.      As such, it was not entitled to PPP funds. *See*, 13 CFR 120.110(j) ("government-owned entities" are ineligible to receive SBA loans).

5.      Rather, as a government-owned and -controlled entity, Crossroads was eligible for Covid relief funds through programs other than the PPP, including, for example, the American Rescue Plan Act and the State and Local Fiscal Recovery Funds program.

6.      Nevertheless, Defendants represented to the federal government that Crossroads was eligible for a PPP loan.

7.      Because Crossroads received, and kept, more than $2 million in PPP funds for which it was ineligible, eligible small businesses were denied the opportunity to borrow and use that PPP money.

## HISTORY OF THE FALSE CLAIMS ACT

8.      Pursuant to the PPP, the Federal Government spent hundreds of billions of dollars in stimulus funding, as well as other federal funding, to support and aid small businesses through the coronavirus pandemic.

9.      The FCA was enacted during the Civil War, and was substantially amended in 1986, and again in 2009 and 2010. Congress amended the FCA in 1986 to enhance the Federal Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as a primary tool for combating government fraud, was in need of modernization. The amendments create incentives for individuals to come forward with information about fraud against the Federal Government without fear of reprisals or inaction, and enable the use of private legal resources to prosecute fraud claims on the Federal Government's behalf.

10.      The FCA prohibits, *inter alia*: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and (2) knowingly making or using,

or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. §§ 3729(a)(1)(A), (B). Anyone who violates the FCA is liable for a civil penalty for each such claim, plus three times the amount of the damages sustained by the Government. 31 U.S.C. § 3729(a)(1)(A) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [28 U.S.C. § 2461 note; Public Law 104-410]).

11.    In 2009, Congress amended the FCA to clarify that a "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest…" 31 U.S.C. § 3729(b)(2).

12.    The FCA allows any person having information about an FCA violation to bring an action for himself and the Federal Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on Defendant during that time) to allow the Federal Government time to conduct its own investigation and to determine whether to join the suit.

13.    Based on the foregoing laws, *qui tam* Plaintiff/Relator seeks through this action to recover all available damages, civil penalties, and other relief for the violations alleged herein in every jurisdiction to which each Defendant's misconduct has extended.

## **PARTIES**

14.    Plaintiff/Relator J. Bryan Quesenberry ("**Relator**") is a resident of Utah. He is an attorney licensed to practice law in Utah and brings this action on behalf of the United States of America, the real party in interest.

15.     Defendant Crossroads is a government-owned entity located in Prince Edward County, Virginia.

16.     Defendants Unknown John and Jane Does are the officers, managers, or agents of Crossroads who caused it to submit the false claims described herein.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Although this issue is no longer jurisdictional after the 2009 amendments to the FCA, upon information and belief there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

18.     Moreover, whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the information on which the allegations or transactions in this Complaint are based. Relator exhaustively researched and discovered the pertinent entity information regarding Crossroads. Relator used private, subscription-based services such as Dun & Bradstreet and the Nexis news library to research employee, business, and other pertinent information. Relator was then able to gather and compile information and evidence from various websites and sources and add his own analysis to identify and accurately describe the allegations of fraud set forth herein. Moreover, there are no publicly disclosed allegations of false claims against Defendants (despite the fact that more than five years have elapsed since they applied for and received the PPP funds at issue).

19.     Relator then compared information to PPP loan data that lists loan amounts and forgiveness status, but does not disclose the borrower's PPP certifications or other

4

misrepresentations at issue, and, standing alone, does not reveal fraud. Courts addressing PPP have recognized that PPP applications/certifications are non-public, and public SBA datasets do not disclose the "essential elements" of fraud for FCA public-disclosure purposes. *See United States ex rel. Craig v. Hawthorne Machinery Co.*, No. 20-cv-1625, 2024 WL 4294878, at *10–13, 2024 U.S. Dist. LEXIS 173872, at *38-39 (S.D. Cal. Sept. 25, 2024). The fraud alleged here emerged only through Relator's independent analysis and expertise. Relator's allegations were therefore not publicly disclosed through any qualifying channel, are different in kind and degree from generalized public information, and materially add to whatever fragmented public data may exist.

20.    This Court has personal jurisdiction over each Defendant pursuant to 31 U.S.C. § 3732(a) because Crossroads Defendant is a government entity located in this district.

21.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Crossroads is a government entity located in this district, and because violations of 31 U.S.C. §§ 3729 *et seq*. alleged herein occurred within this district.

**THE PAYCHECK PROTECTION PROGRAM**

22.    Congress added sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act **("CARES Act")**. Section 1102 contained a new program called the Paycheck Protection Program **("PPP")** and was part of the U.S. Small Business Administration's **("SBA")** 7(a) Loan Program. These two sections were intended to provide economic relief to small businesses nationwide adversely impacted by the coronavirus pandemic and the COVID-19 Emergency Declaration issued by then-President Trump on March 13, 2020.

23.    Due to the COVID-19 emergency, many small businesses nationwide were experiencing economic hardship as a direct result of the Federal, State, and local public health measures that were being taken to minimize the public's exposure to the coronavirus.

5

24.    The SBA received funding and authority through the CARES Act to modify existing loan programs and establish the new PPP loan program to assist small businesses nationwide adversely impacted by the coronavirus pandemic.

25.    Section 1102 of the Act temporarily permitted SBA to guarantee 100% of 7(a) loans under the PPP. Section 1106 of the CARES Act provided for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

26.    The CARES Act was intended to provide relief to America's small businesses expeditiously.

27.    The CARES Act gave lenders delegated authority to process loan applications for PPP funding. SBA allowed lenders to rely on certifications of the borrowers in order to determine eligibility of the borrower and use of loan proceeds, and to rely on specified documents provided by the borrower to determine qualifying loan amount, and eligibility for loan forgiveness. Lenders were held harmless for borrowers' failures to comply with PPP rules.

28.    On the PPP application, the applicant or a representative was required to certify in good faith to a number of representations to the Federal Government. The second bullet point under the CERTIFICATIONS AND AUTHORIZATIONS section on the PPP loan application states:

> ***The Applicant is eligible to receive a loan*** under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule). [Emphasis added].

29.    Another certification on the application states, "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

30.    Applicants also "further certif[ied] that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

31.    Finally, applicants certified that they "underst[ood] that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

**ALLEGATIONS**

**Government-Owned Entities Were Not Eligible to Receive PPP Loans**

32.    Title I, Section 1102(a)(i)(D)(i) of the CARES Act indicates that borrowers must comply with certain eligibility requirements.

33.    The Code of Federal Regulations further adds that "government-owned entities" are ineligible to receive SBA loans, including PPP loans. 13 CFR 120.110(j).

34.    A government-owned entity is an entity owned by a municipality or other political subdivision. *See*, SBA SOP 50 10 5(K), p. 108 ("Businesses owned by municipalities and other political subdivisions are not eligible."). In this context, ownership is synonymous with control – a government-owned entity is a government-controlled entity. To argue that one is different from the other raises a distinction without a difference. This interpretation is supported by the following sources.

35.    The Federal Deposit Insurance Corporation (FDIC) issued General Guidance on Practices for Marketing to a Government-Owned Entity (GOE) in which the FDIC described GOEs as including "traditional government agencies, departments, and public enterprises" as

7

well as "government-owned and government-controlled entities." *See*, General Guidance, p. 8, at

https://www.fdic.gov/about/diversity/sbrp/410.pdf.

36.    A GOE is similar to a state-owned enterprise, which is characterized as:

    a.  An entity formed by the government for the purpose of engaging in commercial activities;

    b.  Fully or partially owned by the government;

    c.  Representing the government in commercial endeavors. *See*, https://www.investopedia.com/terms/s/soe.asp#:~:text=A%20state-owned%20enterprise.

### Crossroads Is A Government-Owned Entity

**37.**    The following information establishes that Crossroads is a government-owned entity.

38.    Crossroads is a "Community services board" defined by VCA § 37.2-100(7) as "the ***public body*** established pursuant to § 37.2-501 that provides mental health, developmental, and substance abuse services ***within each city and county that established it***." (Emphasis added).

39.    The Virginia Legislature requires every city or county to establish a community services board. VCA § 37.2-500(A) ("***Every city or county shall establish a community services board by itself or in any combination with other cities and counties***, unless it establishes a behavioral health authority pursuant to Chapter 6 (§ 37.2-600 et seq.). In order to provide comprehensive mental health, developmental, and substance abuse services within a continuum of care, ***the community services board shall function as the single point of entry into publicly funded mental health, developmental, and substance abuse services***." (Emphasis added).

40.    "The board appointed pursuant to this section shall be responsible to the governing body of each county or city that established it." VCA § 37.2-501.

41.    Crossroads' bylaws further establish it as a government-owned and -operated entity:

a.    "***The purpose of the Board shall be to act as the agent of Amelia, Buckingham, Charlotte, Cumberland, Lunenburg, Nottoway, and Prince Edward Counties,*** Virginia, in the establishment and operation of community mental health, intellectual and developmental disability, and addiction and recovery treatment services in accordance with Chapter 5 of Title 37.2 of the Code of Virginia (2015), as amended." Bylaws, Art. II.[1] (Emphasis added).

b.    "The membership of the Board shall consist of fourteen (14) individuals who shall be appointed by the Board of Supervisors of the county they represent in accordance with Section 37.2-501 and 37.2-502 of the Code of Virginia."[2]

c.    "***The Board shall be the agent of the governmental entities which have established it and shall be subject to the laws and regulations relating to such agencies of those governments*** and shall have the general powers, duties, and responsibilities of a Board as outlined in 37.2-504 of the Code of Virginia (2015), as amended."[3]

d.    Board meetings are subject to Virginia's Freedom of Information Act and public meetings laws.[4]

42.    The Crossroads Board's audited financial statements for the years ended June 30, 2021 and 2020, were "prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) ***as applied to governmental units***."[5] (Emphasis added)

43.    These financial statements also note that, "In accordance with the determination by the Virginia Department of Behavioral Health and Developmental Services that ***all operating***

---

[1] https://crossroadscsb.org/wp-content/uploads/2023/04/Crossroads-Board-By-laws.pdf

[2] *Id.* at Art. III, Sec. 1.

[3] *Id.* at Art. IV (emphasis added)

[4] *Id.* at Art. VII, Sec. 6 and 7.

[5] https://projects.propublica.org/nonprofits/display_audit/7904820211

9

*service boards in Virginia are governmental healthcare entities*, [the Commission] follows the governmental enterprise model."[6]

<u>**Crossroads' PPP Loan**</u>

44.    Crossroads applied and was approved for a first-draw PPP loan on April 13, 2020 (loan number 4917457109), in the amount of $2,497,027.50, received said PPP loan, and had said PPP loan forgiven on May 18, 2021, in the amount of $2,523,365.50.

45.    Upon information and belief, Crossroads retained its PPP funds and has not repaid them.

<u>**Additional Allegations Regarding Defendants' Scienter and Knowledge**</u>

46.    Defendants had the opportunity and obligation to read and review the few certifications on their PPP loan applications that included the following: "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program…" Defendants were also required to initial their understanding and acceptance of this certification. This particular certification was not buried in dozens of pages of legalese, but was one of a handful of key certifications requiring initialing on the second page of a two-page PPP application.

47.    Further, the SBA had provided publicly available PPP loan guidance and published an April 2, 2020, PPP rule specifying that only certain entities were eligible for PPP loans, and that the list of eligible entities was found in 13 CFR 120.110. Specifically, the April 2 rule stated, "Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2,

---

[6] *Id.* (Emphasis added).

except that nonprofit organizations authorized under the Act are eligible." This CFR (13 CFR 120.110) defined the entities eligible for such SBA loans. More specifically, subjection (j) of this CFR stated that government-owned entities were not eligible.

48.     A reasonable response from each Defendant should have been to ask, *Is this organization eligible for a PPP loan* <u>and</u> *what are the applicable PPP eligibility rules now in effect*? A simple Google search for "PPP loan eligibility rules" would have resulted in the discovery of either the SBA's April 2, 2020, interim final rule or one of many legal blogs discussing and analyzing the SBA's April 2 rule.

49.     Deliberate ignorance captures "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple in queries which would alert him that false claims were being submitted." *U.S. v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008). Those receiving federal funds, like Defendants, have "some duty to make a limited inquiry so as to be reasonably certain they are entitled" to those funds." *Id*.

50.     In fact, legal blogs and law-firm websites provided their readers and clients with precisely the same analysis immediately after the April 2 rule was published – i.e., that the SBA's April 2 rule was effective immediately and that applicants should review their eligibility. Here are a few excerpts from these blogs and websites:

- ***On April 2, 2020, in the late afternoon, the Small Business Administration issued an interim final rule*** (Docket No. SBA-2020-0015, the "Rules") for the administration of the Paycheck Protection Program (PPP) created under Section 1102 of the CARES Act. ***The SBA states that the Rules are effective immediately***, which takes the extraordinary step of dispensing with the 30-day delayed effective date provided in the Administrative Procedure Act.
  \*\*\*
  The Application states that the applicant certifies to its eligibility to receive a PPP loan under the version of the Rules in effect at the time the Application has been submitted.
  \*\*\*
  The Rules state that except for nonprofits made eligible for PPP loans under the CARES Act, businesses that are identified in 13 CFR 120.110 and

11

described further in SBA's Standard Operating Procedure (SOP) 50 10, Sub-
part B, Chapter 2 are not eligible for PPP loans. Those businesses generally
include:
\*\*\*
Government-owned entities. [*See*, blog printout attached in **Exhibit A**, pgs. 1-
2; emphasis added.]

- The Rules and Application were issued just hours before the scheduled launch
of the PPP, which, as previewed in the U.S. Treasury Department's borrower
information sheet released on Tuesday, March 31, 2020, is set to begin April
3, 2020. The Rules and Application contain some significant clarifications as
to how the SBA will implement the CARES Act and confirm that certain of
the SBA's existing rules, which broadly impact borrower eligibility for PPP
loans, will apply.
\*\*\*
Ineligible Industries. The Rules likewise confirm that the existing SBA regu-
lations (in 13 C.F.R. § 120.110) regarding eligibility apply to the PPP. There-
fore, businesses in certain industries remain ineligible for loans under 7(a) of
the Small Business Act. [*See*, blog printout attached in **Exhibit B**, pgs. 1, 3;
emphasis added.]

51.    Defendants either failed to research these readily available legal blogs, or ask the

foregoing simple, basic questions to determine eligibility (which would have constituted deliber-

ate ignorance or reckless disregard), or did ask these questions, but nevertheless proceeded to ap-

ply for the PPP loan knowing that they were ineligible for the loan (which would also have con-

stituted deliberate ignorance or reckless disregard).

52.    Defendants acted at best without conducting due diligence, or at worst despite

having done so, and proceeded as if no SBA rule was in effect and applicable at the time to eligi-

bility.

53.    Each Defendant effectively stuck its head in the sand, ignored performing the

most basic form of due diligence (i.e., a Google search), and behaved as if no SBA rules or regu-

lations applied to its eligibility (despite the eligibility certification on the PPP loan application).

54.    Defendants disregarded the applicable nonprofit rules of the PPP program, which

they knew and understood, when they submitted their PPP loan applications.

55.     But for Defendants representing to the SBA on their PPP loan application that they were eligible for PPP loans, the SBA and Defendants' lenders would not have approved their PPP loan applications, paid the PPP money to Crossroads, and forgiven the PPP loans in question.

56.     Defendants had the benefit of the SBA's April 2, 2020 Interim Final Rule and the SBA's April 6, 2020 FAQ guidance document to learn that Crossroads was not eligible for a PPP loan, and that 13 CFR 120.110(j) rendered it ineligible.

**Additional Allegations Regarding Defendant Crossroads' Nonprofit Status**

57.     Crossroads describes itself as a "public nonprofit," and appears to enjoy 501(c)(3) tax-exempt status with the IRS. Nonprofits were generally ineligible for first-draw PPP loans, except for 501(c)(3) or 501(c)(19) tax-exempt organizations.

58.     Notwithstanding Crossroads' 501(c)(3) status, it was ineligible for a PPP loan as a government-owned entity, *see* 13 C.F.R. § 120.110(j) (2020), and as an entity that, because of such governmental ownership, could not certify in good faith that economic uncertainty necessitated the loan, *see* Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. 116-136, division A, title I, sec. 1102(a), § 7(a)(36)(G)(i)(I), 134 Stat. 281, 291 (2020) (codified at 15 U.S.C. § 636(a)(36)(G)(i)(I)). Congress and the Small Business Administration ("SBA") manifested their intent to exclude government-owned non-profits by creating special exceptions for such entities that were destination marketing organizations or hospitals. *See* Consolidated Appropriations Act, 2021, Pub. L. 116-260, sec. 318(2)(C), § 7(a)(36)(D)(vii)(II), 134 Stat. 1182, 2014-15 (2020) (codified at 15 U.S.C. § 636(a)(36)(D)(vii)(II)); SBA, *Business Loan Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act*, 86 Fed. Reg. 3692, 3697 & n.26, Part III.B(g)(vii) (Jan. 14, 2021); SBA, *Business Loan Program Temporary*

13

*Changes; Paycheck Protection Program*, 85 Fed. Reg. 23450, 23451, Part III.2(c) (April 28, 2020).

## CAUSES OF ACTION

### COUNT 1
**Violations of the FCA, 31 U.S.C. § 3729(a)(1)(A) Against All Defendants
(Submitting a False Claim for Approval)**

59. The above paragraphs are realleged and incorporated herein.

60. The FCA imposes liability on one who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

61. Defendants knowingly presented or caused to be presented to the SBA claims for approval of Crossroads' PPP loan and forgiveness thereof for which Crossroads was ineligible as a government-owned entity and one that could not certify economic need for the funds.

62. Defendants' knowing false certifications on the PPP loan applications at issue herein were material to the government's decision to approve and then forgive Crossroads' PPP loan. When submitting the applications, Defendants were required to certify compliance with SBA's guidance and rules, that Crossroads was eligible for the funds, and that all information included on the application forms was true and accurate in all material respects.

63. But for Defendants' submission of the false claims, Crossroads would not have received the loans.

64. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

14

65. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729, *et seq*.

Additionally, the United States is entitled to the maximum penalty of up to $28,619 for

each and every violation arising from Defendants' unlawful conduct alleged herein.

<u>COUNT 2</u>
**Violations of the FCA, 31 U.S.C. § 3729(a)(1)(B) Against All Defendants**
**(Creating a False Record or Statement Material to a False Claim )**

66. The above paragraphs are realleged and incorporated herein.

67. The FCA imposes liability on one who knowingly makes, uses, or causes to be made or

used a false record or statement material to a false or fraudulent claim paid or approved

by the U.S. government. 31 U.S.C. § 3729(a)(1)(B).

68. Defendants knowingly made or caused to be made false records or statements to support

false claims submitted to the SBA in conjunction with Crossroads' PPP loan.

69. The false records or statements Defendants made were used to support false claims sub-

mitted to the U.S. government.

70. By reason of Defendants' acts, the United States has been damaged, and continues to be

damaged, in a substantial amount to be determined at trial.

71. This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729, *et seq*.

Additionally, the United States is entitled to the maximum penalty of up to $28,619 for

each and every violation arising from Defendants' conduct alleged herein.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, *qui tam* Plaintiff/Relator prays for judgment against Defendants as fol-

lows:

1.  That this Court enter judgment against Defendants in an amount equal to three times

the damages the United Sates has sustained because of Defendants' actions, plus a

civil penalty of not less than $14,308 and not more than $28,619 (28 CFR § 85.5) for

each violation of 31 U.S.C. § 3729;

2.  That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §

3730(d);

3.  That Relator be awarded all costs of this action, including attorney's fees and ex-

penses; and

4.  That Relator recover such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury.

Respectfully submitted,

/s/
Bruce Ellis Fein (VSB No. 44049)
Bruce Ellis Fein, PLLC
P.O. Box 506
Great Falls, Virginia 22066
703-248-0390
bruce@newdream.net
*Attorney for Plaintiff-Relator*
 *J. Bryan Quesenberry*

16